# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**ANGELA D. GARRETT,**

      **Plaintiff,**

**vs.**                                    **CASE NO.  5:04cv65-RH/WCS**

**MICHAEL J. ASTRUE,[1]**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the

decision of the Commissioner be reversed and the case be remanded.

**Procedural status of the case**

      Plaintiff, Angela D. Garrett, applied for a period of disability and disability

insurance benefits on October 16, 2000.  The first decision of the Administrative Law

---

    [1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007,
and is automatically substituted as Defendant.  FED. R. CIV. P. 25(d).

Judge, denying the application, was rendered on August 16, 2002.  Doc. 47, p. 1.  The case made its way to this court, but was remanded pursuant to sentence 6 of 42 U.S.C. § 405(g) on May 24, 2004, for further consideration.  Doc. 12.

A second decision was rendered by an Administrative Law Judge on September 8, 2005, again denying the claim.  Doc. 47, p. 2.  Review was denied by the Appeals Council on April 25, 2006.  *Id.* and doc. 29.  The record was filed on October 12, 2006, doc. 34, but there was delay in filing the supplemental record, which was not filed until January 17, 2007, doc. 43.  The parties have now filed memoranda in support of their respective positions.  Docs. 45 and 47.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past
       relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Analysis**[2]

    **Evidence submitted to the Administrative Law Judge**

    Plaintiff was 42 years old at the time of her second administrative hearing, has a

12th grade education, and has past relevant work as a bulb sorter, correctional officer,

and assembler.  R. 13, 31.  Plaintiff alleges disability due to sleep apnea, obesity, neck,

back, and shoulder pain, and depression.  R. 109.  The ALJ found that Plaintiff has a

---

[2] Definitions in this section are from PHYSICIANS' DESK REFERENCE, available from
Westlaw or from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:
http://www.mercksource.com (Medical Dictionary link).

residual functional capacity to do a reduced range of light work.  R. 19.  She concluded, therefore, that Plaintiff had the residual functional capacity to do work as a companion, telemarketer, or surveillance system monitor, and, therefore, was not disabled as defined by Social Security law.  R. 18, 20.

Plaintiff testified that she has not performed gainful work because of back and leg pain, and difficulty walking due to her leg problems.  R. 35-36.  She stated she could not stay seated for long periods of time because of back pain, "like I'm sitting on pins and nerves in my back."  R. 36.  She said her back pain was "about an eight" on a ten point scale and pain of this severity occurred about four days a week.  R. 40-41.

Plaintiff also described pain in her thigh and right leg.  R. 41-42.  She said that her right leg would "get numbness. . . [e]very day, every night," and that her daily pain in her right leg "is about a seven."  R. 42.  Plaintiff also described pain and numbness in her shoulder occurring every day and rating about a seven.  R. 43.

Plaintiff said she has a "sleep problem" causing her "trouble waking up" and sleepiness during the daytime.  R. 37.  She said that this was caused by sleep apnea. R. 38.  Two or three times a week she said she has chest pain caused by acid reflux. R. 39.  She said that medication would resolve this pain, but she might still have it if she did not pay attention to what she eats.  R. 40.

Plaintiff said her doctors directed her to "try to lose some" weight, but because of her back pain, she is not able to do any exercise.  R. 44.  At the time of the hearing, Plaintiff weighed 260 pounds and stood 5' 5" tall.  *Id.*

Plaintiff also described her depression.  She said that she cries a lot and sometimes wonders whether "I want to live or go on."  R.  45.  Plaintiff takes Lexapro[3] for her depression and it helps "[n]ot much, a little."  *Id.*

Plaintiff has had asthma since childhood.  R. 54.  Plaintiff said she has allergies that affect her throat and ears.  R. 49.

Plaintiff said that she had recently been sent to a neurologist for testing for her leg.  R. 50.  She said she had not received the results yet.  *Id.*  She had been told that her problems were probably caused by a nerve in her back.  *Id.*

Plaintiff said that she did not do any cooking around the house.  R. 51.  She could drive a motor vehicle around the block, and she owned a car.  R. 45, 55.  She was able to shower, but needed help sometimes.  R. 46.  She said she had trouble dressing and needed help to fix her hair.  *Id.*  She said that she could not lift a gallon of milk with her right hand because the arm went limp, and she had pain in her right arm and back.  R. 48.  She said she could not turn a doorknob or open a bottle.  R. 42.  She thought that she could sit for only 15 to 20 minutes.  R. 52.  Plaintiff states that she cannot walk a block because of shortness of breath, back pain, and her right leg condition.  R. 47.  She did some grocery shopping.  R. 55.  Plaintiff's only other daytime activities are to read magazines, the Bible, and to watch television.  R. 56.  Plaintiff said that she worked steadily since 1976 until she became disabled.  R. 58-59.

---

[3] Lexapro is an orally administered selective serotonin reuptake inhibitor used as an antidepressant, for treatment of major depressive disorder.  PHYSICIANS' DESK REFERENCE (2005).

From July 1, 1997, through October 31, 2000, Plaintiff was treated for a hiatal hernia or gastroesophageal reflux disease, and epigastric pain by Dr. Leonard Leichus. R. 221-245.  Her symptoms initially "markedly" improved with Prilosec, but then she did not respond to that medication.  R. 242, 240.  On August 29, 1997, Plaintiff underwent an esophagogastroduodenoscopy which revealed mild distal esophagitis, a small hiatal hernia, and mild gastritis.  R. 239.  She was found to have chronic gastritis.  R. 235.  By November 12, 1997, Plaintiff was again doing "remarkably well on" Prilosec and Reglan. R. 233.  She continued to do well on these medications on March 25, 1998.  She continued to do well until October 31, 2000, when the notes end.  R. 225, 223, 221.

On April 20, 1998, a chiropractor, Bruce P. Maring prepared an assessment of Plaintiff's injuries resulting from a car accident on November 27, 1997.  R. 208-212.  He said that Plaintiff had sustained 8% whole person permanent impairment due to cervical and lumbar injuries.  R. 211.  He said that Plaintiff should avoid lifting from the floor, working with her hands over her head, bending, remaining in a seated position for more than one hour, carrying objects such as a bag of groceries, or having her head tilted backward for any length of time.  R. 212.

A report from Dr. Slade of the Tallahassee Sleep Disorders Center indicates that Plaintiff has moderate obstructive sleep apnea.  R. 214.  Plaintiff was seen repeatedly by Dr. David Huang from June 7, 2000, to October 9, 2001, who also found mild sleep apnea and encouraged Plaintiff to join Weight Watchers to lose weight.  R. 288-292. She was also cautioned by Dr. Slade "about driving since the level of daytime sleepiness may be severe."  R. 214.  Dr. Huang issued the same cautions about driving a motor vehicle.  R. 289.

On August 23, 2000, Plaintiff was seen by Michael Williams, D.O., with complaints of low back pain radiating into her buttocks.  R. 262.  On examination, she had tenderness in the L4-L5 region, but the straight leg raising test was negative.  *Id.* An x-ray revealed early minimal changes of degenerative disc disease.  R. 261. Stretching exercises were prescribed, with physical therapy as the next step, if needed. R. 259.  Plaintiff returned on October 9, 2000, without much improvement, and said she could not afford physical therapy.  R. 258.  Plaintiff returned on October 17, 2000, complaining of sharp pain radiating from her neck into her head and down the back on the left.  R. 257.  The assessment was cervical-lumbar strain.  *Id.*  It was noted that her sleep apnea needed treatment.  *Id.*  She returned on November 16, 2000, and her application for Medicaid, to pay for physical therapy, had been turned down because Plaintiff owned land.  R. 256.  Again, the diagnosis was chronic lumbar sprain.  *Id.*

Plaintiff returned to Dr. Williams on December 4, 2000, reporting that she was "miserable."  R. 254.  She had tried to do home exercises but it was not helping.  *Id.* She had no insurance and could not afford physical therapy.  *Id.*  Tenderness at L4-L5 and L5-S1 was noted, with decreased range of motion with "splinting and guarding."  *Id.* Dr. Williams had nothing further to suggest, since physical therapy was not affordable, other than "narcotic agents" and to continue her home exercises.  *Id.*  He continued his diagnosis of chronic lumbar sprain.  *Id.*

Plaintiff saw Dr. Julian Giraldo on August 6, 2001, with numbness in her fingers and toes, headaches, and pain in the back.  R. 297.  She said that she had had chronic back pain for several years following several motor vehicle accidents.  *Id.*  Increased

pain was noted upon rotation of the head and straight leg raising, Tinel's sign[4] was positive bilaterally, and the cervical and lumbar spine were slightly tender to palpation. R. 296-297.  She was diagnosed with chronic neck and back pain with paresthesia.[5]  On August 20, 2001, Plaintiff reported that her neck pain was about the same without change.  *Id*.  Dr. Giraldo's assessment was chronic neck and back pain.  R. 295.  She was also suffering from rhinitis.  *Id*.  Dr. Giraldo referred her to a neurologist.  *Id*.

Plaintiff reported atypical chest pains to Dr. Giraldo on September 5, 2001.  R. 295.  In November, 2001, Plaintiff was treated at Jackson Memorial Hospital for shoulder pain.  R. 309.  She had arm pain, with tingling from her shoulder to her fingers. R. 310.  She was given an injection of Toradol[6] that provided "good relief."  *Id*.  She was discharged with mild to no pain.  R. 313.

Plaintiff had a mental health consultative examination over a year later, on January 4, 2003, by Lawrence Annis, Ph.D.  R. 562.  She said that her primary problems were severe sleep apnea, and severe chronic neck and back pain.  *Id*.  She

---

[4] Tinel's sign is:  "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[5] Paresthesia is an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.  Formication is a tactile hallucination in which there is a sensation of tiny insects crawling over the skin.  *Id*.

[6] Toradol is a nonsteroidal anti-inflammatory (NSAID) drug.  It is "indicated for short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level.  It is NOT indicated for minor or chronic painful conditions." PHYSICIANS' DESK REFERENCE (2004), p. 2966.

said that she does things "slowly and carefully because of chronic pain, difficulty bending, limited range of motion, poor balance, fatigue, and weakness."  R. 563.

Dr. Annis observed Plaintiff walking slowly, with an unsteady gait.  R. 563.  She sat stiffly, and frequently adjusted her seated posture as if uncomfortable.  *Id*.  Rising from the seat appeared to be uncomfortable.  *Id*.

Plaintiff's mood during the interview was depressed.  R. 563.  She reported crying daily, was briefly tearful during the interview, and said that "sometimes [she] wished she could go to sleep and not wake up."  *Id*.  She was preoccupied with physical problems and physical discomfort.  *Id*.  Dr. Annis diagnosed Plaintiff with major depressive disorder, recurrent.  R. 564.  Dr. Annis stated he thought that "[s]ome degree of depression is likely to continue so long as she is experiencing major physical problems."  *Id*.  He said Plaintiff was "socially handicapped by depression and anxiety." *Id*.  Dr. Annis concluded:

> Evidence was found of depression and anxiety to the degree that occupational achievement is impeded.  If Ms. Garrett's physical condition permits work, she would require more encouragement than do most people when encountering work difficulties or social challenges.  She would probably not do well in occupations requiring frequent, protracted or demanding social interaction, such as waitress, cashier, or sales clerk.  If she is physically able, she is likely to do better in vocations that deal mostly with things, such as dishwasher, data entry operator, or cleaner.  Out patient mental health care would probably be beneficial.  Due to her distraction to physical and emotional factors, she should presently avoid occupations requiring technical precision, driving, operating machinery, or contact with dangerous substances.

R. 564.

On February 25, 2003, Plaintiff returned to Jackson Memorial Hospital with neck and back pain.  R. 303-308.  She reported pain that was severe, with pain radiating into her right middle finger.  R. 308, 303.  Toradol and Lortab[7] were prescribed.  R. 306.

Plaintiff was seen by Dr. Muhammed Naeem on February 27, 2003, for a physical consultive evaluation.  R. 565.  Dr. Naeem found Plaintiff to be "[p]ositive for severe depression most of the time."  R. 566.  On examination, Dr. Naeem found no vertebral tenderness or paravertebral muscle spasms, and her back appeared to be normal.  R. 567.  Plaintiff reported pain in all movements.  *Id.*  Dr. Naeem felt that Plaintiff's symptoms that looked like fibromyalgia.  *Id.*  He also found that Plaintiff had hypertension, asthma, sleep apnea (unable to receive treatment recommended by her pulmonologist), and severe depression.  *Id.*  He concluded that Plaintiff needed medical and psychiatric treatment and "needs a lot of motivation to come out from recent situation and [be] able to resume some type of reasonable work and to get some gainful employment."  *Id.*

On September 28, 2003, Plaintiff presented again to Jackson Memorial Hospital with complaints of painful urination, back pain, and numbness down her right leg.  R.

---

[7] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Lortab is used to treat severe pain.  <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005).

317.  She was seen by Dr. John Griffin and was prescribed Lortab, Pyridium,[8] and

Bactrim[9] DS.  R. 318.

Plaintiff returned to Jackson Memorial Hospital on August 17, 2004, a year later,

continuing to complain of back and neck pain.  R. 356.  She returned with the same

complaint on September 14, 2004.  *Id.*  Plaintiff was seen on September 15 and 18,

2004, by Dr. Duane Herring at the Jackson Memorial Hospital emergency room for back

pain and was prescribed pain relief medications, Lortab and Darvocet.  R. 326, 330.  An

x-ray on September 18, 2004, revealed no acute injury or active disease of the spine.

R. 357.  This was noted on October 21, 2004.  R. 354.

On October 21, 2004, Plaintiff returned to the hospital, complaining of right thigh

numbness increasing in the last month, back pain, and difficulty walking.  R. 355.  She

still reported this numbness on November 4, 2004, but upon examination, she had no

weakness of the lower extremities and sensation was intact on both thighs.  R. 354.

She was referred to a neurologist for evaluation of right thigh numbness.  R. 353.  An

appointment was made for her with Dr. George of Bay Cares on November 18, 2004.

*Id.*

On December 1, 2004, Plaintiff was again seen at the hospital.  Her weight was

269 pounds.  R. 353.  She was to see the neurologist on December 28, 2004.  *Id.*

---

[8] Pyridium is a trademark preparation of phenazopyridine hydrochloride, a urinary analgesic to relieve symptoms of irritation of cystitis, urethritis, pyelonephritis, prostatitis, and other conditions of the lower urinary tract mucosa.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.   See also R. 333 (urinary tract analgesic).

[9] Bactrim is an anti-infective prescribed for urinary tract infections.  THE PILL BOOK, 5th Ed. (1992), Bantam Books, pp. 805-806.

Lortab was discontinued with the explanation that she should not take that medication for an extended period.  *Id.*

Plaintiff was referred by Dr. Karin Maddox of the Brain and Spine Center for tests concerning her complaints of right leg numbness.  R. 337.  A nerve conduction study was performed on January 2, 2005, by Dr. Mian Li to "rule out several conditions including compression of the lateral cutaneous nerve of the thigh."  *Id.*  Several tests were normal, however "[b]oth lateral cutaneous [nerves] of the thigh showed no recordable evoked response."  *Id.*  Dr. Li concluded that the

> absence of evoked responses noted in the lateral cutaneous nerve of the thigh can be seen in either mononeuropathy such as lateral cutaneous of the thigh neuropathy or normal variance.  The correlation of clinical symptomatology and electrical findings will be necessary.

*Id.*

A physical capacities evaluation was performed on March 1, 2005, by Dr. Kongsak Chantornsaeng.  R. 335.  He thought that Plaintiff could sit for one hour at a time, stand or walk for 15-20 minutes at a time, and during an 8 hour day, sit or stand and walk only one hour a day.  *Id.*  He said that she was unable to use her right leg for pushing or pulling leg controls, and could not do simple grasping, pushing, pulling, or fine manipulation with her right hand and arm.  *Id.*  He said that he did not think that Plaintiff could engage in work for 8 hours a day, 5 days a week.[10]  *Id.*

---

[10] Initially he mistakenly marked the answer to this question "yes," but this was clarified and changed to what he had originally intended.  R. 334-335.

**Evidence submitted only to the Appeals Council**

The Administrative Law Judge's decision was on September 8, 2005.  Some

evidence that pre-dated and post-dated that decision was submitted to the Appeals

Council after the decision.  The following is a discussion of that evidence.  A report by

Dr. Maddox of the Brain and Spine Center, LLC, dated December 28, 2004, includes a

diagnosis of meralgia paresthetica[11] and stated that Plaintiff would start taking Neurontin

and receive the nerve conduction velocity (NCV) test described above.  R. 388.

A report by Dr. Maddox dated June 8, 2005, indicated that Plaintiff's Neurontin

prescription would be increased and that Plaintiff would proceed with a lateral femoral

cutaneous nerve block.  R. 387.  She was encouraged to lose weight.  *Id.*

Dr. Kamel Elzawahry performed the outpatient femoral cutaneous nerve block on

June 21, 2005, without incident.  R. 386.  On September 12, 2005, Plaintiff again saw

Dr. Maddox, complaining of right thigh numbness with "minimal associated pain."  R.

385.  Dr. Maddox noted that while the nerve block did not relieve her leg numbness it

did provide "improvement with regard to pain."  *Id.*

A second nerve block was performed September 20, 2005, by Dr. Elzawahry.  R.

384.  Plaintiff had a follow up appointment with Nurse Practitioner Stephanie Breland for

Dr. Maddox on December 19, 2005.  R. 382-383.  Plaintiff complained of "low back pain

with numbness and tingling radiating down her left leg" and that because of her left leg,

she could not get comfortable.  R. 382.  Nurse Breland said that it was suspected that

---

[11] Meralgia is pain in the thigh.  Paresthetica is a type of entrapment neuropathy
caused by entrapment of the lateral femoral cutaneous nerve at the inguinal ligament,
causing paresthesia, pain, and numbness in the outer surface of the thigh in the region
supplied by the nerve. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

she had "significant nerve root compression." *Id.* She said that an MRI of Plaintiff's lower back revealed nerve root compression at L5-S1 and a disk bulge with spondylosis at L4-5 and L5-S1. *Id.* The right meralgia paresthetica was present but stable. *Id.* The report indicated that further nerve tests would be performed, Plaintiff would receive lumbar epidural injections, continue with Lortab for pain relief and begin taking Flexeril. R. 383. A walking cane was also prescribed. R. 405.

On September 30, 2005, Plaintiff complained of left hip pain radiating to her left foot for the prior three days, and lower back pain. R. 397. The straight leg raising test (SLRT) was positive on the left side. *Id.* The diagnosis was chronic low back pain with possible left lumbar radiculopathy.[12] *Id.*

An MRI was performed on October 18, 2005. R. 401. It was noted that:

> Osteophytes and the bulging annulus fibrosus [fibrosis] impinge on the anterior aspect of the spinal canal and invertebral foramina at L4-5 and L5-S1, especially L5-S1, a little more on the left side than the right. It is suspected that there may be significant nerve root compression at these levels, especially at L5-S1.

*Id.* The opinion was that there was spondylisthesis, more pronounced at L5-S1. *Id.* "No actual herniation of the disc is noted, but there is bulging of the annulus fibrosus [fibrosis] at each of these levels with osteophytes, and the bulges are central, extending more to the left side than the right." *Id.*

On the next day, October 19, 2005, Plaintiff was again seen by her physician, with pain in the left hip radiating to the left foot. R. 396. Some weakness was noted in

---

[12] Radiculopathy is disease of the nerve roots and often manifests as pain. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

the left leg.  *Id*.  On December 5, 2005, Plaintiff reported that she had fallen four times in the last month.  R. 392.  She was given a prescription for a cane.  *Id*.

On December 19, 2005, Plaintiff returned for examination.  R. 382.  Plaintiff continued to report that she had low back pain with numbness and tingling down her left leg, pain that she described as a constant, radiating pain like a toothache.  *Id*.  She had been "very miserable" since her last visit.  *Id*.  Her lumbar paraspinous region was tender to palpation, she had decreased range of motion with forward flexion and hyperextension, and pain was elicited.  *Id*.  The straight leg raising test was positive on the left.  *Id*.  Another nerve conduction velocity test and an EMG was scheduled.  R. 383.  She was given Lortab for pain.  *Id*.

> **Whether the Commissioner erred in finding Plaintiff's January, 2005, nerve conduction tests were normal**

> As noted earlier, Dr. Li concluded from this test that the

> absence of evoked responses noted in the lateral cutaneous nerve of the thigh can be seen in *either* mononeuropathy such as lateral cutaneous of the thigh neuropathy *or* normal variance.  *The correlation of clinical symptomatology and electrical findings will be necessary*.

R. 337 (emphasis added).  The Administrative Law Judge concluded that the January 2, 2005, test results were "within normal limits."  R. 14.  Plaintiff contends that this was error, given the evidence of her symptoms.

Plaintiff is correct.  The passage above from Dr. Li is not substantial evidence in the record to conclude that the results were within normal limits.  Dr. Li did not make that conclusion.  Indeed, an absence of evoked responses would seem on its face to be abnormal.

Given this ambiguity, the ALJ had a duty to inquire further. Where there is an ambiguity in the treating physician's records or opinion, the Administrative Law Judge should take steps to clarify the ambiguity.

> Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). The Commissioner's regulations provide that if "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled,"

> [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available. *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved . . . .*

20 C.F.R. § 404.1512(e)(1) (emphasis added).[13]

---

[13] "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ." Sims v. Apfel, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), *citing* Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997), *citing* Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

> However, there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record. The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice."

129 F.3d at 1423 (citations omitted). The question is "whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" Brown v. Shalala, 44

There was some evidence that Plaintiff's symptoms that were consistent with abnormality.  On October 21, 2004, Plaintiff reported right thigh numbness increasing in the last month, back pain, and difficulty walking.  R. 355.  Further, the ALJ had evidence from Dr. Kongsak Chantornsaeng, who, on March 1, 2005, found that Plaintiff lacked the capacity to do work for 8 hours, 40 hours a week.  R. 335.  Finally, had the ALJ inquired of Plaintiff's treating physicians as to the meaning of the test, other significant evidence would have come into the record.  A month before the test, Dr. Maddox had diagnosed an abnormal condition, meralgia paresthetica.  R. 388.

It is recommended, therefore, that the court reverse the decision of the Commissioner and remand to acquire additional evidence.  Some of that evidence is in the record as presented to the Appeals Council, but additional relevant evidence may also exist.

### Whether the Commissioner erred at step 2 in failing to find that Plaintiff suffered minimally from depression

The Administrative Law Judge described the findings of Lawrence Annis, Ph.D., and Muhammad Naeem, M.D., regarding depression.  R. 15.  She only discussed the findings of Dr. Annis, and she did not mention depression as a "severe" impairment in her step 2 analysis.  *Id.*

Plaintiff argues that it was error to fail to give reasons for giving no weight to the findings of Drs. Annis and Naeem.  Plaintiff also contends that failure to find that her

F.3d 931, 935 (11th Cir. 1995) (citations omitted).

depression was a "severe" impairment at step 2 is not supported by substantial evidence in the record.

At step 2 of the analysis, the issue is whether Plaintiff has shown that she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), quoting Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be

disabled even if their age, education and experience were taken into consideration." *Id.*, *quoting* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987). In <u>Flynn</u>, the court expressed concern that by making a finding of no severe impairment at step 2 of the analysis, the Commissioner had foreclosed the claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities." 768 F.2d at 1274.

Dr. Annis diagnosed Plaintiff with major depressive disorder, recurrent. R. 564. He said he thought that "[s]ome degree of depression is likely to continue so long as she is experiencing major physical problems." *Id.* He concluded there was evidence "of depression and anxiety to the degree that occupational achievement is impeded." *Id.*

Dr. Naeem found Plaintiff to be "[p]ositive for severe depression most of the time." R. 566. He concluded that Plaintiff needed medical and psychiatric treatment and "needs a lot of motivation to come out from recent situation and [be] able to resume some type of reasonable work and to get some gainful employment." *Id.*

Neither Dr. Annis nor Dr. Naeem were treating medical sources, so the rules regarding the weight to be given such sources do not apply.[14] The Administrative Law Judge discounted the opinion of Dr. Annis because he saw Plaintiff "on only one occasion and his opinions are not supported by the substantial medical evidence." R. 15. She also discounted his opinion because Dr. Annis did not find that Plaintiff "was precluded from all types of work," that Plaintiff "was prescribed Lexapro and appeared

---

[14] The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).

to have good results," that she never sought or received extensive treatment or counseling, and none of her treating physicians said that "extensive treatment was necessary." R. 16.

The reasons given for discounting the opinion of Dr. Annis and finding that Plaintiff's depression did not meet the minimal threshold of severity at step 2 are not supported by substantial evidence in the record. The issue at step 2 is not whether Plaintiff was precluded from all types of work by depression, but whether depression had more than a minimal effect upon her ability to work. Dr. Annis said that there was evidence "of depression and anxiety to the degree that occupational achievement is impeded." R. 564. This is more than a minimal effect. The reference to other treating physicians, that none said that extensive treatment was needed, is true, but Plaintiff's treating physicians repeatedly found her to be "miserable" when she was examined. Dr. Annis may have only examined Plaintiff on one occasion, by psychology was his field of expertise and he examined her, making observations about her mood.

Plaintiff had tried Remoran prior to March 26, 2004, and she hallucinated; Lexapro was prescribed on that date. R. 325. Lexapro was found to be "helping" on April 29, 2004. R. 322. At the administrative hearing on May 12, 2005, Plaintiff testified that Lexapro helped a little, but "not much." R. 45. This is all of the evidence about the effects of Lexapro. Thus, the finding that Plaintiff apparently had good results with Lexapro is not supported by substantial evidence in the record.

Finally, the ALJ did not explain the weight to be given to Dr. Naeem's observations. His observations strongly support a finding that Plaintiff's depression was a "severe" impairment as defined at step 2. Consequently, it was error at step 2 to have

failed to find that Plaintiff's depression was a "severe" impairment to be considered in combination with other impairments at steps 3, 4, and 5.  A remand for reconsideration of Plaintiff's depression, in combination with other impairments, is needed at steps 3, 4, and 5.

### Whether the Appeals Council erred in rendering a decision to deny review without acknowledging receipt of the additional evidence

The Appeals Council said that Plaintiff could submit additional evidence "pertinent to the issues considered in the hearing decision dated September 8, 2005." R. 406.  The evidence, therefore, was limited by relevance to issues considered.  It was not limited to evidence that pre-dated the decision.  Plaintiff submitted additional evidence, and that evidence has been described above.  All of the evidence was pertinent to the issues considered in the hearing decision dated September 8, 2005, and much of the important evidence pre-dated that decision, though some was a bit after the decision.

The Appeals Council declined to assume jurisdiction, thus declining to review the decision of the Administrative Law Judge.  R. 379.  It said that it had "considered the medical evidence of record and the testimony at the hearing."  *Id.*  The new evidence was "medical evidence of record" at the time the Appeals Council declined review.

Plaintiff seeks review of the decision of the Commissioner in this case.  Doc. 1, ¶ 1.  Indeed, that is as it should be since this court's jurisdiction is to review "any final decision of the Commissioner of Social Security."  42 U.S.C. § 405(g).  The decision of the Appeals Council denying review is, in part, a decision of the Commissioner.

Williams v. Commissioner of Social Security, 407 F.Supp.2d 1297, 1302-1303 (M.D. Fla. 2005).

When the Appeals Council has denied review and the Plaintiff seeks review of that decision, the denial of the Appeals Council is subject to review in this court if it "amounts to an error of law." Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998), *cert. denied*, 525 U.S. 1124 (1999) (dicta); Williams v. Commissioner of Social Security, 407 F.Supp.2d 1297, 1302 (M.D. Fla. 2005); Hurley v. Barnhart, 385 F.Supp.2d 1245, 1253-1254 (M.D. Fla.), *aff'd*, 147 Fed.Appx. 103 (11th Cir. 2005); Zaldivar v. Apfel, 81 F.Supp.2d 1353, 1363 (N.D. Ga. 2000); Haws v. Apfel, 61 F.Supp.2d 1266, 1285-1286 (M.D. Fla. 1999).[15]

> To review the AC's denial of review, courts will have to look at the pertinent evidence to determine if the evidence is new and material, the kind of evidence the AC must consider in making its decision whether to review an ALJ's decision.

Falge v. Apfel, 150 F.3d at 1324.  Evidence is "new and material" "if it relates to the period on or before the date of the administrative law judge hearing decision." *Id.*, *quoting* 20 C.F.R. § 404.970(b).

The evidence submitted to the Appeals Council in this case was new, material, and much of it related to the period on or before the Administrative Law Judge's decision.  Plaintiff is correct that the Appeals Council erred in failing to acknowledge receipt of this specific new evidence.  Remand is needed to consider this new evidence,

---

[15] In Falge, the Plaintiff had not sought review of the decision of the Appeals Council to deny review.  150 F.3d at 1324.

as well as for the reasons discussed above, which may involve consideration of

additional evidence.

> **Whether the Commissioner erred in considering at step 5 work as a
> companion or as a telemarketer when the Commissioner failed to
> identify any skills that Plaintiff had that would transfer to those jobs**

"When an ALJ makes a finding that a claimant has transferable skills, he must

identify the specific skills actually acquired by the claimant and the specific occupations

to which those skills are transferable."  Dikeman v. Halter, 245 F.3d 1182, 1185 (10th

Cir. 2001).

> An ALJ can find a claimant's acquired skills are transferable to other jobs
> "when the skilled or semi-skilled work activities [the claimant] did in past
> work can be used to meet the requirements of skilled or semi-skilled work
> activities of other jobs or kinds of work.  This depends largely on the
> similarity of occupationally significant work activities among different jobs."
> 20 C.F.R. § 404.1568(d)(1).  "Transferability is most probable and
> meaningful among jobs in which – (i) The same or a lesser degree of skill
> is required; (ii) The same or similar tools and machines are used; and (iii)
> The same or similar raw materials, products, processes, or services are
> involved."  *Id.* § 404.1568(d)(2).

*Id.*

Here, the ALJ assumed that the transferability of skills was not an issue in this

case.  R. 20.  She found, however, that the jobs of companion and telemarketer are

semi-skilled and that Plaintiff could do that sort of work.  R. 18.  She also found that

Plaintiff could do the unskilled job of surveillance system monitor.  R. 19.  Plaintiff does

not challenge this latter finding, but does contest the finding as to the first two jobs.

Defendant concedes that Plaintiff is correct as to the jobs of companion and

telemarketer.  Doc. 47, p. 7.  Defendant notes that the surveillance system monitor job

is unskilled and is an appropriate job to consider, assuming that Plaintiff's residual

functional capacity has been correctly determined, and Plaintiff has not challenged this argument.  On remand, therefore, it would seem that the surveillance system monitor job could again be considered once Plaintiff's residual functional capacity has been determined.  The other two jobs also could be considered, but only if specific relevant transferable skills are identified.

**Conclusion**

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** for reconsideration consistent with this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on April 17, 2007.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**